STATE v. ADAMS.

(Filed May 23, 1905.)

*Homicide—Evidence as to Other Crimes—Circumstantial Evidence—Footprints—Motive—Practice.*

1.　The rule that evidence as to one offense is not admissible against a defendant to prove that he is also guilty of another and distinct crime, is subject to well defined exceptions, to-wit: it is admissible to produce evidence of a distinct crime to prove scienter, to make out *res gestae* or to exhibit a chain of circumstantial evidence of guilt in respect to the act charged.

2.　No particular formula or set of words is required in regard to the force of circumstantial evidence, and it is sufficient if the judge charges the jury in substance that the law presumes the defendant to be innocent and that the burden is upon the State to show his guilt and that upon all the testimony they must be fully satisfied of his guilt.

3.　It is not necessary that footprints should be identified in any particular manner, nor in an instruction to the jury thereon is there any fixed phrase of the law applicable to all cases.

4.　The existence of a motive may be evidence to show the degree of the offense, or to establish the identity of the defendant as the slayer, but motive is not an essential element of murder in the first degree, nor is it indispensable to a conviction, even though the evidence is circumstantial.

5.　In an indictment for murder, where the State relies upon a motive, such as robbery, it is not necessary to prove that the prisoner at the time of the killing knew the fact from which the alleged motive may be inferred.

6.　In a criminal action, the court is not required to select a single fact from the mass of the testimony, and charge the jury that the proof as to that must exclude every reasonable hypothesis except the defendant's guilt.

INDICTMENT against Will Adams for murder, heard by *Judge Fred Moore* and a jury, at the January Term, 1905, of the Superior Court of WAKE County.

This case was before us at a former term when we ordered a new trial for the reason stated in the opinion of the court. 136 N. C., 617. The defendant was indicted in the court below for the murder of Mary Bridgers on Friday, January 22, 1904. The testimony tended to show that Robert Bridgers and his wife (the deceased) and their three children lived in a house off the public road and about a mile and a half from the defendant's home. The defendant had passed Bridgers' house and inquired of him how much money he had made. Bridgers told him he made $300. Defendant afterwards asked Bridgers to change ten cents, which Bridgers refused to do, saying that he did not keep money, but that his wife kept his money. Defendant was at Bridgers' house the day before the homicide was committed and asked Mary Bridgers when her husband was going to town and when he would come back. She told him her husband would go the next morning and return about sunset. He then asked where her husband was at that time and she replied: "Yonder he comes with his gun on his shoulder. He has been hunting." Defendant was then standing in the yard, and as Bridgers approached him he left hurriedly without speaking to Bridgers, though he was in speaking distance. Early Friday morning the defendant was seen going in the direction of the Bridgers house. He did not arrive at the Massey home where he worked until 9 or 10 o'clock in the forenoon and remained there only until noon, when he left and went in the direction of the Bridgers place. At one o'clock he was seen at the latter place standing at the corner of the house. About sunset of the same day he was seen coming out of the woods or old field between the Bridgers house and the public road. He was running at the time and his behavior was unusual. Crossing the road, he "squatted down" behind a holly bush as if trying to conceal himself. One of the witnesses who saw him spoke to him and asked him what he was doing there and he made no reply.

STATE *v.* ADAMS.

The witness remarked to his son who was in the buggy with him: "That negro has done something mean; he is scared to death; it may be one of the negroes who broke out of jail." His son replied: "No, it is Will Adams." They left him there, and he was next seen at his own house about one o'clock in the night, when the officer went to arrest him. His conduct at that time was peculiar. He refused to answer when he was called, and, when the officer attempted to arrest him, he resisted and struck at the officer with a stick and threatened to kill him. He did not submit until the officer threatened to shoot him with his gun. The officer examined his clothing and found that his trousers and shoes and socks were wet. Tracks were found by the holly bush and from the holly bush along a hedge row and thence on to the creek, and tracks were also found at the creek, indicating that some one had forded it at the place where it was crossed, and from the creek to the defendant's house, tracks corresponding with those already mentioned were found at Bridgers' house and from the house to the place where Mary Bridgers' body was found, about one hundred yards away, and from that place back to the house. Tracks were also found from the holly bush to a path at a point about 100 yards from the body. There was much evidence tending to show that all of these were tracks of the defendant. Robert Bridgers left his house early Friday morning for Raleigh, and returned at sunset the same day. As he approached the house, he called his wife but received no answer. He then went to the house and found two of his children badly wounded and in a dying condition. He rode rapidly on his mule to the house of a neighbor and the two returned to Bridgers' house. Bridgers examined his bureau and found that his money, $6.00 in all, had been taken. He went to the back door of the house and, seeing tracks, he followed them to the place, about 100 yards from the house in the cotton patch, where he found his wife's dead body. Her head

had been crushed, and the coroner, who is a physician, testi-
fied that it was done with a blunt instrument like the eye
of an axe, and there was evidence tending to show that blood
was found on the axe at the woodpile, a few steps from the
house. There were two tracks from Bridgers' house to the
place where the body was found; one the track of a man,
and the other the track of a woman, and the tracks of a
man returning to the house. The tracks from the house to
the place where the body was found indicated by their appear-
ance that the man and the woman were running when they
were made. The defendant was searched by the officer who
arrested him and two half-dollar pieces and four coppers
were found in his pockets. One of the silver coins was a
very bright piece and apparently had never been used; the
other was older and darker. They were identified by Brid-
gers as two of the pieces taken from his bureau drawer. The
defendant's statement, when asked by the examining magis-
trate as to his whereabouts on Friday, was contradicted by
witnesses acquainted with the facts.

The defendant objected to all evidence relating to the
finding of the children by Bridgers in his house when he
returned from Raleigh and to their condition, as not being
pertinent to the issue, and, upon its being admitted, he excep-
ted. The defendant asked that the following instructions be
given to the jury:

1. When circumstantial evidence is relied upon to con-
vict, it must be clear, convincing and conclusive in its con-
nection and combination, and must exclude all ratonal
doubt as to the defendant's guilt. And, therefore, if the evi-
dence as to the footprints in this case is not clear, satisfac-
tory, convincing and conclusive to the minds of the jury, in
other words, if such evidence does not point with moral cer-
tainty to the guilt of the defendant and to that of no other
person, then the jury should acquit the defendant, unless the
whole evidence in the case, after leaving out of consideration

the evidence bearing upon the footprints, is sufficient to satisfy fully the minds of the jury as to the guilt of the defendant.

2. It is essential that the correspondence between the tracks and the feet or shoes of the defendant, to have a decisive bearing, should be proved by actual comparison as by bringing the two into juxtaposition and placing the shoe into the impression, or by actual measurement of the two and a comparison of the measurements.

3. The footprints are insufficient to establish guilt if they are not distinguished from ordinary footprints by any peculiar marks, and the correspondence between them and the tracks of the defendant is merely in superficial shape, outline and dimensions.

4. If the State has satisfied the jury from the evidence beyond a reasonable doubt that Mary Bridgers was killed, and also from the evidence of footprints that the defendant, Will Adams, was in such a situation as made it possible for him to have committed the act, then it is incumbent on the State to show, if possible, that Will Adams had a motive for so doing, for where the State relies on circumstantial evidence to convict, the motive becomes not only material, but controlling, and in such cases the facts from which it may be inferred must be proved. It cannot be imagined any more than any other circumstance in the case, and the burden is on the State to show to the jury beyond a reasonable doubt that the defendant had a motive for the commission of the act.

5. The court instructs the jury that the proof of the facts from which motive is to be inferred must be clear, satisfactory, convincing and conclusive, and exclude any other reasonable hypothesis than that of the defendant's guilt. And further, that such facts must be proved to have been known to the defendant at the time of the homicide. Therefore, since the State relies upon robbery as the motive in this case,

the court instructs you that the burden is on the State to satisfy the minds of the jury beyond a reasonable doubt not only that Robert Bridgers, the husband of the deceased, had money in the house in which he lived, but that the defendant killed Mary Bridgers in furtherance of an attempt to take such money."

The court refused to give these instructions and the defendant excepted. The court gave other special instructions asked by the defendant and charged the jury generally in regard to the facts and the law. There was no exception to the general charge. There was a verdict of guilty of murder in the first degree. Judgment was pronounced thereon and the prisoner excepted and appealed.

*Robert D. Gilmer, Attorney-General,* for the State.
*W. B. Snow* and *E. M. Shaffer* for the prisoner.

WALKER, J., after stating the facts: The defendant objected to the testimony of Robert Bridgers as to the condition of his children when he found them on his return to his home, upon the ground that it was not pertinent to the issue, and his counsel argued before us that if it was pertinent for any purpose it should have been restricted by the court in its charge to that purpose. There was no error committed in regard to this testimony. True it is that evidence as to one offense is not admissible against a defendant to prove that he is also guilty of another and distinct crime, the two having no relation to or connection with each other. But there are well defined exceptions to this rule. Proof of another offense is competent to show identity, intent or scienter, and for other purposes. In *State v. Murphy,* 84 N. C., 744, the court held that "it is important not to confound the principles upon which the two classes of cases rest. On the one hand it is admissible to produce evidence of a distinct crime to prove scienter, or to make out *res gestae* or to ex-

hibit a chain of circumstantial evidence of guilt in respect to the act charged," and on the other the evidence should be limited to these exceptions and should be excluded when it does not legitimately fall within their scope.   Wharton Cr. Law (7 ed.), sec. 650 and 631. And so in *State v. Thompson,* 97 N. C., 498, this court discussing an objection similar to the one now made, said: "The circumstances strongly pointed to a single agency, and with the ownership of the rope, with which the kindling materials were bound, to the defendant as the guilty author of both of the firings. The facts proved are parts of one continuing transaction, and are but the development of the conduct of the person by whom the successive acts were done," citing Wharton Cr. Law, sec. 649.   While the last case cited is closely analagous to this one, the case of *State v. Mace,* 118 N. C., 1244, is perhaps more like it. There, the defendant was indicted for murder and this court held it competent to show an assault upon a witness, it being connected with the offense charged and material evidence upon several grounds as tending to show, among other things, that the act was done to prevent a discovery of the defendant's crime, so that he could escape its probable consequences, and also to show that the homicide he was charged to have committed was wilful, intended and not merely accidental, deliberate and premeditated.   "Crimes," says Underhill, "leading up to or connected with the homicide, so that they form parts of one transaction, may be proved as parts of the *res gestae* to illustrate the conduct and disposition of the accused about the time of the homicide."   Underhill Crim. Ev., sec. 321.   He then says in the same section: "It may be shown that in the same affray or immediately before or after, the accused killed or attempted to kill another person than the one for whose homicide he is on trial," if the homicides are connected with each other and were committed at or about the same time and place.   *State v. Graham,* 121 N. C., 623 ; *State v. Jeffries,* 117 N. C., 727.   We think the condition

of the children was an essential part of the transaction and
an important link in the chain of circumstances tending
to prove the guilt of the defendant. As His Honor said
below, this cannot be separated from the other facts, and we
say the story of this horrible tragedy cannot be told without
it. There is no error in the ruling of the court and this
exception is not sustained. The case of *People v. Molineux,*
168 N. Y., 264, is not in point. There, the homicides, if
there were two committed, were separated by long intervals
of time, occurred in widely separated places and were in-
duced manifestly by different motives, and they were not in
any way connected with each other, so far as appeared. The
other cases cited by the defendant's counsel are equally inap-
plicable. They come within the rule and not within the
exception.

Nor did the court err in refusing to give the first prayer
for instruction. There is no particular formula by which
the court must charge the jury upon the intensity of proof.
"No set of words is required by the law in regard to the
force of circumstantial evidence. All that the law requires
is, that the jury shall be clearly instructed, that unless after
due consideration of all the evidence they are 'fully satisfied'
or 'entirely convinced' or 'satisfied beyond a reasonable doubt'
of the guilt of the defendant, it is their duty to acquit, and
every attempt on the part of the courts to lay down a 'for-
mula' for the instruction of the jury, by which to 'guage' the
degrees of conviction, has resulted in no good." We repro-
duce these words from the opinion delivered by *Pearson,
C. J.,* in *State v. Parker,* 61 N. C., 473, as they present in
a clear and forcible manner the true principle of law upon
the subject. The expressions we sometimes find in the books
as to the degree of proof required for a conviction are not
formulas prescribed by the law, but mere illustrations. *State
v. Sears,* 61 N. C., 146; *State v. Knox, Ibid.,* 312; *State v.
Norwood,* 74 N. C., 247. The law requires only that the jury

shall be fully satisfied of the truth of the charge, due regard being had to the presumption of innocence and to the consequent rule as to the burden of proof. *State v. Knox, supra.* The presiding judge may select, from the various phrases which have been used, any one that he may think will correctly inform the jury of the doctrine of reasonable doubt, or he may use his own form of expression for that purpose, provided always, the jury are made to understand that they must be fully satisfied of the guilt of the defendant before they can convict him. In *State v. Gee,* 92 N. C., 761, where the court below had refused to charge according to one of these supposed formulas, and told the jury that it was not a rule of law but only an illustration and intended to impress upon the jury the idea that they should be convinced beyond a reasonable doubt of the defendant's guilt, the court, by *Smith, C. J.,* said: "We do not see in the charge, or in the manner of submitting the case to the jury, any error of which the defendant has a right to complain." If the judge charges the jury in substance that the law presumes the defendant to be innocent and the burden is upon the state to show his guilt and that upon all of the testimony they must be fully satisfied of his guilt, he has done all that the law requires of him, the manner in which it shall be done being left to his sound discretion to be exercised in view of the facts and circumstances of the particular case.

The second and third prayers were properly refused. We are not aware of any principle of law which requires that footprints should be identified in the manner described. Expressions of the kind used in the prayers may perhaps be found in the books and, if so, they were intended merely as illustrations to make the law clearer to the jury in some peculiar state of the facts, and not as containing in themselves any fixed phrase of the law applicable alike to all cases. Besides, in this case it appears that the defendant made tracks at the holly bush and along the hedge row where he was seen

STATE *v.* ADAMS.

in the afternoon of the day on which the homicide was committed; that those tracks extended to the creek where he forded it and from the creek to the house where he lived, and that they corresponded in appearance with the tracks at and near the Bridgers house. There was other strong and convincing proof of the identity of the tracks at the place of the homicide with those of the defendant.

The fourth prayer does not embody a correct principle of law and should not have been given. It is not required that a motive should be shown under the circumstances recited in the prayer. When the evidence is circumstantial, the proof of a motive for committing the crime is relevant and sometimes is important and very potential, as it may carry conviction to the minds of the jurors, when otherwise they would not be convinced. This is all that is meant by the court in the cases cited by counsel. *State v. Green,* 92 N. C., 779. Murder may be committed without any motive. It is the intention deliberately formed after premeditation, so that it becomes a definite purpose, to kill, and a consequent killing without legal provocation or excuse that constitutes murder in the first degree. The existence of a motive may be evidence to show the degree of the offense, or to establish the identity of the defendant as the slayer, but motive is not an essential element of the crime, nor is it indispensable to a conviction of the person charged with its commission. *State v. Wilcox,* 132 N. C., 1143; *State v. Adams,* 136 N. C., 620. There was no error in refusing to give the instruction contained in the fifth and last prayer. If the instruction thus asked to be given to the jury was proper in form and correct in all its parts, we yet do not think it is necessary where the State relies upon a motive, such as robbery, that it should be required to prove that the defendant at the time of the killing knew the fact from which the alleged motive may be inferred, that is, as in this case, that there was money in Bridgers' house. There is evidence in this record that he had

knowledge of that fact, though there was no such evidence at the first trial. Bridgers told the defendant that he had money and that his wife kept it for him. It was said in the former opinion that knowledge by the defendant of the fact must be shown in order to prove a motive, when it consists in robbery, but that language was used in reference to the charge of the court, then being discussed, that the taking of the money from the house was one of the facts which tended to establish the defendant's guilt, the court holding that this could not be so unless it had been shown either that the defendant knew that the money was in the house or that some of the stolen money was found on his person or in his possession, and there was no proof of either of those facts. That money was stolen must be some evidence that the motive was robbery, even though the defendant did not know there was money in the house and even though none of the money was found in his possession. It was not sufficient by itself to show that the defendant was the thief. It may be further said of this prayer that the court is not required to select a single fact from the mass of the testimony and charge the jury that the proof as to that must exclude every reasonable hypothesis except the defendant's guilt. Such a charge would necessarily mislead the jury by directing their attention to that fact as the pivotal one of the case, and to convincing proof of its existence as the crucial test of his guilt. It is sufficient, in order to preserve and safeguard all the rights of the defendant, to charge the jury as His Honor did, and, as we have already shown, is quite in accordance with settled principles of the criminal law, that the jury should weigh all the facts and circumstances which they find to be established by the testimony, giving the defendant the benefit of any reasonable doubt, and unless they are fully satisfied, upon a consideration of all the evidence and under the instructions of the court as to the law, that the defendant is guilty, they should acquit. The court fully explained to the

STATE *v.* ADAMS.

jury the difference between the degrees of murder, and in all respects the charge was clear and comprehensive and presented the case to the jury in every conceivable phase. It was substantially responsive to all of the defendant's prayers for instruction, so far as they are warranted by the facts and the law.

It is proper to refer to the rare skill and ability with which the defense in this case has been conducted by the learned counsel assigned by the court. The record shows an unusually strong presentation of the defendant's case in the court below by his counsel, who have served him with untiring zeal and singular devotion throughout the case, and without any reward for their services, except that which will come to them from the consciousness of duty well performed. In this court, at both hearings, we have had the benefit of able and exhaustive arguments in the defendant's behalf. We are constrained, though, after a most attentive consideration of the record, the arguments and the briefs of counsel, to declare that no error was committed by the court at the last trial.

No Error.